## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RANDALL D. ROTH, | ) | CASE NO. 4:09CV3054 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| MICHAEL J. ASTRUE, | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on the denial, initially and on reconsideration, of the Plaintiff's disability insurance ("disability") benefits under the Social Security Act ("Act"), 42 U.S.C. §§ 401, *et seq.,* and supplemental security income ("SSI") benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* The Court has carefully considered the record and the parties' briefs.

### PROCEDURAL BACKGROUND

The Plaintiff, Randall D. Roth, filed for disability and SSI benefits on June 9, 2005. (Tr. 20.) Roth alleges that he has been disabled since October 2004, based primarily on social phobia, and also on left-leg deep venous thrombosis ("DVT"), arthritis, spondylosis, and chronic low back pain. (Tr. 107, 138, 507.) The claims were denied initially and on reconsideration. (Tr. 413-24.) An administrative hearing was held before Administrative Law Judge ("ALJ") Jan E. Dutton on October 31, 2007. (Tr. 503.) On May 16, 2008, the ALJ issued a decision finding that Roth was not "disabled" within the meaning of the Act and therefore is not eligible for either disability or SSI benefits. (Tr. 30.) The ALJ concluded that, although Roth suffers from medically determinable impairments, he can

still perform past relevant work as well as other work existing in significant numbers.  (Tr. 23-31.)  On January 22, 2009, the Appeals Council denied Roth's request for review.  (Tr. 5-7.)  Roth now seeks judicial review of the ALJ's determination as the final decision of the Defendant, the Commissioner of the Social Security Administration ("SSA").  (Filing No. 1.)

Roth claims that the ALJ's decision was incorrect because the ALJ: (1) failed to give controlling weight to his treating psychiatrist, Dianna Clyne, M.D.; (2) discounted the opinion of Roth's mental health therapist, Linda Paugels; (3) reached a residual functional capacity finding that is not supported by substantial evidence; (4) improperly found Roth's testimony not credible; and (5) improperly determined that Roth can perform past relevant work.

Upon careful review of the record, the parties' briefs and the law, the Court concludes that the ALJ's decision denying benefits is supported by substantial evidence on the record as a whole.  Therefore, the Court affirms the Commissioner's decision.

## FACTUAL BACKGROUND

**Roth's Testimony**

At the hearing, Roth testified to the following. At the time of the hearing he was 50 years old, had earned a GED, and rated his intelligence as average.  (Tr. 511-12.)  Roth has three felony convictions for failure to pay child support, and he served time in prison on all three convictions.  (Tr. 512.)  He has had six DUIs.  (Tr. 540.)  He has one child who was twenty-four years old at the time of the hearing, has been married twice, and lives with his girlfriend.  (Tr. 513.)  His girlfriend is unemployed, on disability, and supports Roth.  (Tr. 513, 524.)  Roth gets free medical care at a county clinic, but he pays for care at

2

CenterPointe.  He gets money from his mother to buy 12-packs of beer.  (Tr. 524.)  Roth does laundry and does some cooking.  (Tr. 525, 529.)  Roth cannot vacuum or do dishes.  (Tr. 526, 529.)

In 1989, after leaving prison Roth worked as a wood cutter in a factory, and he left due to his alcohol addiction.  (Tr. 515.)  He worked as a meat packer for Gold Leaf of Nebraska.  In 1994 through 1996 he worked for Gerber Pet Food, where he packed and stacked trays of pet food meat.  He left this job when he went to prison.  (Tr. 515-16.)  In 1997-98, Roth worked for a garbage hauling company where he had previously worked while on work release.  He left the job because he lacked transportation to and from work.[1] (Tr. 516-17.)  In 1997, Roth unloaded grain trucks at Armor's Co-op.  (Tr. 518.)  In 2000, Roth cut steel at IMS, a machine shop.  He left the job because he lacked transportation to and from work.  (Tr. 519.)  In 2002, Roth worked for Farmland Foods as a laborer pushing and pulling hog carcasses, which hurt his low back and wrists.  He also stacked meat, and the bending required by that job bothered him.  (Tr. 534-35.)  In 2002, Roth also performed construction cleanup for Labor Ready until he went to prison for a parole violation.  (Tr. 519-20.)  After Roth's 2003 release from prison, the only job he had was making boxes for different products for three or four weeks.  He left this job because he could not pass a physical due to problems with his wrists and back.  (Tr. 522.)  Roth does not believe that he could work in a factory again because of those problems.  (Tr. 523.)  Roth testified that he told vocational rehabilitation personnel to close his file and he then applied for disability.  (Tr. 524.)

---

[1]Roth is often without a driver's license due to his DUI convictions and nonpayment of child support.

Roth testified that he had been sober for three months before the hearing, but that he was a binge drinker from age eighteen until 2004.  At the time of the hearing, he was taking Coumadin, Remeron, Seraquel, and Revia.  He usually gets up at 7:00 a.m., "just sit[s] around the house," and goes for "little walks not very often."  (Tr. 527.)  In the afternoons he watches television.  (Tr. 528.)  Roth likes to fish, but he does not go often because it demands walking and hurts his legs and back.  (Tr. 527-28.)  Roth has no friends other than his girlfriend.  (Tr. 528.)  He reads, though he has difficulty concentrating.  (Tr. 528, 529.)  Roth continues to see his counselor at CenterPointe, Linda Paugels.  Since his last release from prison, he has had one hospitalization for a blood clot.  (Tr. 529.)   Roth also noted that he has arthritis in his knees.  (Tr. 531.)

Roth stated that his back pain started interfering with his ability to work in 2002.  (Tr. 531.)  He can walk four or five blocks before having pain in his leg, knees and back.  He must stand up periodically if he sits for more than ninety minutes, otherwise his back will hurt and his left leg will tingle.  Roth testified that although his doctor wants him to walk and move, excessive movement or sitting causes his leg to swell.  (Tr. 532-33.)  He limits his stair climbing.  (Tr. 535.)  Roth can lift up to fifteen pounds before pain in his low back and wrist set in.  (Tr. 533.)  Roth stated he has had worsening wrist pain for ten years and could not work at a job that requires frequent use of his hands.  (Tr. 533-34.)  He noted that his wrists swell when he uses them a lot, and one activity that causes swelling in his wrists is holding a car's steering wheel.  (Tr. 535-36.)

In March of 2006, Roth had blood clots in his legs. (Tr. 536.) Roth testified that his left leg tingles all the time and swells every day. He testified that he wears ted hose[2] and elevates his leg by sitting in a recliner for about one hour to alleviate the swelling. When his leg swells, he has trouble walking and experiences pain. (Tr. 537-38.)

Roth testified that he experiences social anxiety when he leaves his apartment. Approximately three times weekly he cannot leave the apartment due to his anxiety level, which manifests itself through sweating and a racing heartbeat. (Tr. 538.) His memory and concentration are also affected. He has difficulty walking down the street and going to the grocery store, and therefore his girlfriend routinely does the shopping.[3] (Tr. 539.)

Roth testified that he has had six DUI convictions. The last one was in 1999. Due to his DUIs and convictions for nonpayment of child support, his driver's license is sometimes suspended for periods of two years. At the time of the hearing, his license was suspended for nonpayment of child support, and he walks or takes the bus. (Tr. 540-41.)

**Medical Expert's Testimony**

Dr. Thomas England testified as a medical expert. Dr. England reviewed the record and noted the following diagnosed disorders: anxiety-related; personality; and substance addiction. Dr. England also noted Dr. Clyne's diagnosis of social phobia, and Dr. Stone's diagnosis of social anxiety disorder. (Tr. 543.) Dr. England did not weigh Dr. Stone's diagnosis very heavily, however, as those notes indicate anti-social behavior rather than

---

[2]Medical records show that Roth is noncompliant with the order to wear his ted hose. (Tr. 301.)

[3]Other evidence includes Roth's inconsistent statement that he grocery shops once a week. (Tr. 106.)

5

a diagnosis and Dr. England did not find similar diagnoses by treating professionals.  All treating professionals have diagnosed Roth as having alcohol dependency and, in some cases, his alcohol abuse was said to be "ongoing" or "continuous."  Dr. England observed that after Roth's admission to CenterPointe for treatment his alcohol use was "substantially less."  (Tr. 544.)  Specifically, Dr. England noted that treating medical professionals advised Roth not to drink alcohol while taking Coumadin due to serious potential side effects, yet Roth continued his alcohol use in different amounts; Dr. England noted as examples Roth's consumption of a twelve-pack of beer in one day.  Dr. England counted fifteen instances of relapse in thirty-three months of treatment and, therefore, Roth was still alcohol dependent rather than in remission.  (Tr. 545.)  Dr. England opined that if Roth were not drinking he could  stabilize his treatment for his medical conditions and perform his past unskilled work such as that of a factory worker, and perhaps semi-skilled work. (Tr. 547-48, 551-54.)  Minimizing contact with coworkers and the public would be helpful. (Tr. 547.)

**Vocational Expert's Testimony**

Testimony was also heard from a vocational expert ("VE"), Michael McKeeman, under contract with the Social Security Administration ("SSA").  McKeeman testified that Roth could return to his past work as a construction worker, general laborer, and material handler.  McKeeman also testified that he could perform 70-75% of unskilled work. Examples of unskilled work include production worker, general laborer, janitorial, and bookkeeping.  (Tr. 560-62.)

**Documentary Evidence Before the ALJ**

In addition to oral testimony, the ALJ considered medical evidence.  In July 2002, more than two years before his alleged date of onset of disability, October 2004, Roth went to the emergency room with complaints of a sudden onset of low back pain after lifting a garbage can.  (Tr. 165.)  An examination showed some pain with palpation of his lower lumbar spine and a limited range of motion.  However, Roth's muscle strength was intact.  (Tr. 165.)  An x-ray revealed mild spondylotic changes but no other abnormalities.  (Tr. 165, 168.)  The emergency room physician assessed lower back strain and prescribed pain medication.  (Tr. 165-66.)

In November 2004, Roth began treatment with CenterPointe psychiatrist Dianna Clyne, M.D.  (Tr. 238-39.)  During his initial evaluation, Roth reported: experiencing increased anxiety in group situations; drinking between eighteen and twenty-four beers daily; experiencing withdrawal symptoms; and having difficulty concentrating when trying to read.  Concentration problems started with his drinking.  Roth reported chronic arthritis as his only health problem.  (Tr. 238.)  Other than drinking, he reported that he enjoyed fishing and doing jigsaw puzzles.  Drinking ended both of his marriages.  Dr. Clyne further noted that Roth appeared trustful, cooperative, and logical in his thought process, Dr. Clyne diagnosed Roth with social phobia and alcohol dependence, assigned Roth a current Global Assessment of Functioning ("GAF") score range of 50 to 60, and started Roth on Lexapro.  (Tr. 239.)  In December 2004, Roth returned to Dr. Clyne for treatment as he continued to have a lot of social anxiety and drank alcohol two weeks before the appointment.  On examination, Roth was anxious, alert, oriented, and cooperative, and his

7

memory and insight remained intact.  Roth was having severe alcohol cravings.  Dr. Clyne prescribed Gabitril and increased his Lexapro.  (Tr. 237.)

From January through April 2005, Roth saw CenterPointe nurse practitioner Michelle Lemon monthly for treatment of his social anxiety and alcohol dependence.  (Tr. 232-37.) During his sessions in January, February, and April 2005, Roth reported continued drinking (up to twenty beers in one day), and that he was looking for work.  (Tr. 232, 235, 236.) Although Ms. Lemon noted that Roth appeared anxious throughout her sessions, she stated that his thought process was goal-directed and logical, and that he was pleasant, alert, oriented, and cooperative with good eye contact.  (Tr. 232-36.)

In May 2005, Roth was referred for vocational rehabilitation through the Nebraska Department of Education.  (Tr. 157.)  Roth wanted to work as a truck driver.  (Tr. 155, 157.) In June 2005, Dr. Clyne requested information in connection with Roth's vocational rehabilitation application in which she noted Roth's difficulty obtaining employment due to his anxiety, and she recommended job coaching and placement through vocational rehabilitation services.  (Tr. 174.)

In June 2005, Roth returned to Ms. Lemon for treatment. He said that he had ten beers the previous Saturday.  He reported that he was looking for work.  On examination, Roth appeared pleasant and cooperative.  He had good eye contact, regular speech, a full affect, and goal-directed and logical thought processes.  (Tr. 231.)  Later that month, Roth applied for a commercial drivers license ("CDL") in connection with his vocational rehabilitation inquiry.  (Tr. 178-80.)  In his application, he denied having any history of muscular disease, nervous or psychiatric disorders, chronic low back pain, impairments to

8

his arms or legs, or frequent alcohol use.  Roth listed the following medications: Gabitril; Lexapro; and Seraquil.  (Tr. 178.)

In July 2005, Roth returned for an interview with vocational rehabilitation, during which he discussed the possibility of starting his own business making leather items such as purses, wallets, and belts.  Roth said his social anxiety would prevent him from selling at craft shows.  However, he could market his products individually to businesses.  (Tr. 153.)

Later that month, in completing a Daily Activities and Symptoms Report in connection with his disability application, Roth stated that he could handle his daily personal needs, cook, make his bed, clean his cat boxes, and vacuum.  He said he experienced back pain when vacuuming.  (Tr. 105.) He also wrote that he was fishing eight hours weekly, grocery shopped once a week, and was attending anxiety support groups. He stated his anxiety was worse around people.  (Tr. 106-07.)

In July 2005, Roth again saw Ms. Lemon.  He stated that he was still fishing, recently drank eight beers, and was trying to get disability.  On examination, Roth was pleasant and cooperative, his mood was anxious, his thought process was goal-directed and logical, and he was alert.  (Tr. 225.)

In early August 2005, at the agency's request Roth saw psychologist William R. Stone, Jr., Ph.D., for a consultative disability examination.  (Tr. 186-90.) During the examination, Roth said he was attending group sessions to help with his social anxiety, and that his medications helped him relax.  (Tr. 186.) He stated he was fishing once weekly. He reported cutting back on his prior alcohol consumption of one and a half cases per day after experiencing blackouts, and at the time of the appointment he reported drinking only

9

"a twelve pack a day." (Tr. 186-88.) Regarding anxiety, Roth told Dr. Stone that it took him about one week to become comfortable in a particular social situation. (Tr. 188.) Roth was oriented, his speech was relevant and coherent, his memory was intact, and his intellectual functioning was average. (Tr. 189.) Dr. Stone further noted that Roth's anxiety level did not prohibit functioning. (Tr. 190.) Roth stated that his medications reduced his anxiety to a tolerable level. (Tr. 189.) Based on this interview, Dr. Stone assessed social anxiety in partial remission on medications and ongoing alcohol dependence, and he assigned a GAF score of 61 to 70. (Tr. 189.) He further opined that Roth could perform basic daily living tasks and maintain at least minimally adequate social contacts. Finally, Dr. Stone opined that Roth's mental impairments did not preclude him from understanding and completing short and simple, and even complex and complicated, instructions under ordinary supervision, or from relating appropriately to coworkers and supervisors on a superficial basis. (Tr. 190.)

Later that week, Roth, at the agency's request, saw Steven J. Saathoff, M.D., for a consultative disability examination. (Tr. 181-83.) Roth told Dr. Saathoff that he had low back and knee pain and arthritis. Roth reported, however, that he did not have constant back pain; rather, his pain only occurred with repetitive bending for long durations. He stated that he had not received any prior treatment for his back pain. (Tr. 181.) He reported having trouble standing more than sixty to ninety minutes. Although Roth reported having a history of significant anxiety issues, he told Dr. Saathoff that this issue was then under control. (Tr. 181.) On examination, Roth exhibited full (5/5) grip strength (with tremor), full range of motion in his hands, and full (5/5) muscular strength in his arms

10

and legs.  (Tr. 182.)  Roth could walk heel-and-toe, do a deep knee bend, and manipulate a pen without difficulty.  (Tr. 182.)

In mid August 2005, based on her record review, state agency psychologist Rebecca K. Braymen, Ph.D., opined that Roth had mild restrictions in his daily activities, moderate limitations with social functioning, and mild difficulties with concentration, persistence, and pace.  (Tr. 205.)  In October 2005, Patricia Newman, Ph.D., affirmed Dr. Braymen's opinion.  (Tr. 249.)

In August 2005, based on his record review, state agency physician P. L. Grossman, M.D., opined that Roth could lift fifty pounds occasionally and twenty-five pounds frequently, and sit, stand, and walk six hours each in an eight-hour workday (Tr. 208-13.)  Dr. Grossman further opined that Roth could frequently climb, balance, stoop, kneel, crouch, and crawl.  (Tr. 210.)  In October 2005, Glen Knosp, M.D., affirmed Dr. Grossman's opinion.  (Tr. 248.)

From August 2005 through June 2006, Roth continued to be treated at CenterPointe by Dr. Clyne and Ms. Lemon.  (Tr. 219, 265-73.)  During this time, Roth was pleasant and cooperative with good eye contact.  (Tr. 219, 265, 267-70.)  Dr. Clyne and Ms. Lemon also noted Roth's regular speech, stable mood, full affect, and goal-directed and logical thought processes.  (Tr. 219, 265, 267-70.) Although Roth reported some continued drinking on occasion during this period (Tr. 219, 267, 272), he told Dr. Clyne that his anxiety was less and he was "more comfortable" in group counseling sessions when he was not drinking.  (Tr. 272.)

In March 2006, Roth was hospitalized with DVT after complaints of a three-week history of left-leg swelling.  (Tr. 275, 284.)  During his hospitalization, he reported still

11

smoking cigarettes and drinking at least a six-pack of beer every two to three days.  (Tr. 277-78.)   Although the treating physician started Roth on Coumadin, he did so with reservation given Roth's continued alcohol abuse.  Roth was cautioned about the dangers of alcohol use with Coumadin.  (Tr. 275.)

In April 2006, Roth returned to Dr. Clyne at CenterPointe for treatment.  (Tr. 263.) He reported that he last drank alcohol in March 2006, noting that he drinks a 12-pack once every 2 to 4 months.  Roth was still uncomfortable in social situations, but he stated that he had been with his girlfriend for 2 ½ years in a good relationship.  (Tr. 263-64.)  On examination, Roth's mood was anxious, his affect was appropriate, he was cooperative, his thought process was logical, his stream of thought was unremarkable, and his social judgment, comprehension, and insight were intact.  (Tr. 263-64.)  Dr. Clyne's updated diagnosis was alcohol dependence and social phobia.  (Tr. 264.)

In May 2006, Roth saw Kyle Haefele, M.D., for a follow-up evaluation of his DVT. Roth reported no leg pain, and he had no swelling.  (Tr. 305.)

In June 2006, Roth requested placement in a factory/production full-time job through vocational rehabilitation, stating that he thought he could perform such work. (Tr. 150, 156, 160.) Later that month, Roth returned to Dr. Clyne.  He reported that he drank alcohol as recently as three weeks prior, and that his medication was working well for him.  His appearance was alert, oriented, and cooperative, his mood was anxious, and his affect was appropriate.  (Tr. 261.)

In July 2006, Roth's attorney interviewed his girlfriend, Sharon Zinn.  (Tr. 117-22.) Ms. Zinn stated she was currently on disability for mental health problems.  (Tr. 117.) She said Roth suffers from social anxiety order and panicked around groups of people.  (Tr.

12

118.)  She acknowledged, however, that Roth could run simple errands, usually without complication.  (Tr. 118.)  She believed Roth could not work due to anxiety. (Tr. 119.)

In August and September 2006, Roth returned to Dr. Clyne. (Tr. 259-60.)  Roth reported that he was doing well, and that his medications were working.  However, he had a blood clot in the left leg, which was causing psychosocial stressors.  (Tr. 260.) On examination, Roth appeared alert and cooperative, and his memory and insight remained intact.  (Tr. 259-60.)  He had not used alcohol since June 2006.  (Tr. 260.)

In October 2006, Roth told his vocational rehabilitation services counselor he was no longer interested in looking for work as he was "waiting for approval to receive disability."  He knew the process could take up to nineteen months.  (Tr. 148.)  In November 2006, Roth told Dr. Clyne that his medications were no longer working, and they were adjusted accordingly.  (Tr. 258.)  In December 2006, Roth suffered a second DVT on his left calf.  (Tr. 303.)

In January 2007, Roth returned to Dr. Clyne for an assessment update.  (Tr. 250-53.)  He again appeared very cooperative, his affect was appropriate, and his mood was relaxed.  He was fully oriented, he had good eye contact, and Dr. Clyne described his memory and concentration as "very good."  Roth said he was still living with his girlfriend, and their relationship was going well.  (Tr. 250.) He also reported that he continued to enjoy watching television and fishing, and that his social skills were good individually but he had problems with anxiety when in groups of four or more people.  (Tr. 251.)  Roth continued to drink alcohol about six times during the previous year until he reached intoxication.  (Tr. 252.)  Dr. Clyne assigned Roth a GAF score of 55. (Tr. 253.)

Later that month, Roth saw Ronald Craig, M.D., for his DVT. (Tr. 302.) Roth reported that the pain was pretty much gone from his left leg, although there was some swelling. (Tr. 302.) Roth was told that he should probably be on anticoagulation medication for life, and he was told to quit smoking as this was his major risk factor for DVT. (Tr. 302.) In April 2007, Roth admitted to Dr. Craig that he continued to smoke one package of cigarettes daily and that he was not wearing his prescribed support hose for his DVT. On examination, Roth had some trace edema in his left leg, but the leg was not tender to palpation. Dr. Craig again encouraged Roth to stop smoking and prescribed Chantix to help with that effort. (Tr. 301.) Later that month, Roth saw Dr. Clyne for a medication check. He reported that he was still awaiting his disability determination and was looking forward to the fishing season. He told Dr. Clyne that his medication was working, and he rated his mood at a seven on a scale of one through ten. The report reflects no discussion of smoking cessation or Chantix. Dr. Clyne encouraged Roth to exercise and seek part-time employment. (Tr. 256.)

In May 2007, Roth returned to Dr. Craig for treatment. Dr. Craig noted Roth's smoking habit as his only risk factor for DVT. Roth said he felt fine and had no problems. He had a small knot on his left leg, but he had no pain. Lisinopril was added due to Roth's elevated blood pressure. (Tr. 300.)

Later that month, Roth saw Dr. Clyne for an assessment update. (Tr. 254-55.) He reported drinking alcohol two weeks before after two months of sobriety. Roth said when he relapses he drinks a twelve-pack in one day. (Tr. 254.) He was starting his Chantix that day. He said his social anxiety was improving, and he was now spending more time at the library. (Tr. 254.) Roth said he continued to enjoy fishing, watching television, exercising,

14

and relaxing.  On examination, Roth was alert and oriented, his mood was anxious, his thought process was logical, his stream of thought was unremarkable, and his social judgment and concentration were considered adequate and intact.  Medications were adjusted.  Dr. Clyne assigned a GAF score of 50 to 55 (Tr. 255.)  During a treatment session in June 2007, Roth told Dr. Clyne that he had been "out fishing a few times."  Dr. Clyne continued to assess Roth as clinically stable, and she stated that Roth was bored and "needs something to do."  (Tr. 372.)

In July 2007, Roth's attorney interviewed his girlfriend, Sharon Zinn, a second time.  (Tr. 123-31.)  Ms. Zinn considers Roth's primary disability to be his social anxiety disorder.  (Tr. 123.)  She also stated that Roth could hardly get out of her car due to his back pain, and Roth had trouble lifting even a gallon of milk.  (Tr. 124.)  She stated that Roth was withdrawn and rarely left the house other than to go to the grocery store, CenterPointe, and his doctor.  (Tr. 125.)  She stated that Roth had been fishing only twice during 2007.  (Tr. 127.)

Later that month, Roth told Dr. Clyne that he was doing okay, and that, although he felt "uncomfortable" at the grocery store, he could complete his shopping.  On examination, Dr. Clyne described Roth as anxious, alert, and oriented, with an appropriate affect.  (Tr. 371.)  In August 2007, Roth presented to Robert Rauner, M.D., with complaints of a one-month history of low back pain.  On examination, however, Roth had no tenderness over his lumbar spine, and he exhibited normal leg strength.  Dr. Rauner assessed lumbar strain and prescribed Flexeril as needed for pain relief.  (Tr. 377.)  Later that month, Roth told Dr. Clyne that he was doing well, and that he was waiting to get disability and would then go to work on a part-time basis.  Roth continued to have some anxiety that "comes and goes

15

but no depression." (Tr. 370.) He said he still became "nervous" in social situations but was "improving with counseling." (*Id.* .) Dr. Clyne found Roth to be clinically stable (Tr. 370.)

In September 2007, Roth returned to Dr. Craig for followup on his back pain and smoking cessation. Roth reported that his previous back pain had resolved, and that he was no longer trying to stop smoking. On examination, Roth's back was not tender to palpation. Dr. Craig assessed resolving back pain, reinforced the need to stop smoking, and told Roth to discontinue the Flexeril as his back pain had resolved. (Tr. 376.)

In October 2007, Roth returned to CenterPointe. Despite his complaints of continued anxiety, he reported that he enjoyed fishing and was functioning well. Roth was oriented, his behavior was appropriate, his eye contact was good, his affect was normal, and his thought process was logical and goal-directed. It was noted, however, that Roth was not taking his medication as prescribed. (Tr. 489.)

Later that month, Roth completed interrogatory responses in which he reported that he could not work due to anxiety and pain in his wrists, back, left leg, and knees. (Tr. 138-46.) He reported that, although his doctors had recommended that he stop drinking alcohol, he still drank two or three beers monthly. (Tr. 141.) He reported that he could walk only one hour, stand only two hours, and sit only four to five hours in an eight-hour workday. (Tr. 142.) He also reported that he could lift only between ten and fifteen pounds. (Tr. 142.) As to his hobbies, Roth reported that he used to go fishing weekly but that he had only been a few times yearly since July 2004, because the required walking hurts his back and knees. (Tr. 143.)

16

During that same month, CenterPointe mental health therapist Roth Paugels wrote a letter in support of Roth's disability in which she opined that Roth was disabled based on the intensity of his mental health symptoms.  Ms. Paugels also wrote that, based on his social phobia, it remained very difficult for Roth to do basic things such as leave his home, go to the grocery store, attend medical appointments, and be around other people.  (Tr. 392.)

In November 2007, Dr. Clyne completed a Mental Impairment Questionnaire in which she wrote that Roth avoids social functions and was unable to work around people, even in an individual setting.  (Tr. 397.)  She further opined that Roth had either a poor or no ability to work in coordination with or proximity to others, complete a normal work day or work week without interruption from psychological symptoms, accept instruction and criticism from others, get along with coworkers and peers, interact appropriately with the general public, maintain socially appropriate behavior, and use public transportation.  (Tr. 401-04.)  Finally, she opined that Roth had marked limitations in activities of daily living and marked-to-extreme limitations maintaining social functioning.  (Tr. 405.)

In December 2007, Roth again saw Dr. Clyne.  Roth denied having any depression and stated that his anxiety varied.  His appearance was good, he was alert and cooperative, his affect was appropriate, and his mood was anxious.  (Tr. 488.)

In January 2008, Roth told Dr. Craig that he felt good and continued to smoke.  (Tr. 447.)  The next month, Roth similarly told Dr. Rauner that his medications were working well, that he had no complaints, and that he was still smoking and did not want to quit doing so.  (Tr. 446.)

17

In May 2008, Roth returned to Dr. Clyne.  Dr. Clyne noted Roth's social anxiety and described him as a "worrier."  (Tr. 483.)  Roth reported slight improvement in his social anxiety during the last year.  (Tr. 483.) He was unemployed but had submitted some job applications, and his leisure activities were fishing and watching movies.  Roth was alert, his facial expressions were unremarkable, his eye contact and attention were satisfactory, and he was actively cooperative during the examination.  Dr. Clyne assigned a GAF score range of 50 to 55.  (Tr. 484.)

**Documentary Evidence Submitted to the Appeals Council**

The Appeals Council received the following additional records, including them in the record: 1) a July 16, 2008, letter from attorney Mary Wenzl with copies of medical records; 2) a July 29, 2008, letter from Wenzl with medical records from the Lincoln Lancaster County Health Department; 3) an August 21, 2008, letter from Wenzl with medical records from CenterPointe; and 4) an October 1, 2008, facsimile from Wenzl with medical records. (Tr. 425-502.)

## THE ALJ'S DECISION

After following the sequential evaluation process set out in 20 C.F.R. §§ 404.1520 and 416.920,[4] the ALJ concluded that Roth is not disabled in either the disability or the SSI context.  (Tr. 30-31.)  Specifically, at step one the ALJ found that Roth last performed substantial gainful work activity on July 1, 2004.  (Tr. 22.)  At step two, the ALJ found the following medically determinable impairments that impose more than slight limitations on

---

[4]Section 404.1520 relates to disability benefits, and identical § 416.920 relates to SSI benefits.  For simplicity, in making further references to the social security regulations the Court will only refer to disability regulations.

18

Roth's ability to function: social phobia superimposed on alcohol dependence; recurrent deep vein thrombosis of the left leg; and lumbar strain with mild degenerative disc disease of the lumbar spine.  (Tr. 23.)   At step three, the ALJ found that Roth's medically determinable impairments, either singly or collectively, do not meet Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4, known as the "listings."  (Tr. 25.)   At step four, the ALJ determined that, despite Roth's medically determinable impairments, he possesses the RFC to perform medium labor as described in detail.  (Tr. 26.)  The ALJ found that Roth has the RFC to do his past relevant work as a construction worker, garbage collector, general laborer, and material handler.   Finally, the ALJ concluded that Roth's alcohol dependence is not a contributing factor to the disability determination, inasmuch as his dependence does not meet or equal the listings or limit his ability to function so as to preclude all types of substantial gainful work activity.  (Tr. 30.) In summary, the ALJ found that Roth is not disabled for purposes of disability or SSI.  (Tr. 30, 31.)

## STANDARD OF REVIEW

In reviewing a decision to deny disability benefits, a district court does not reweigh evidence or the credibility of witnesses or revisit issues *de novo*.  Rather, the district court's role under 42 U.S.C. § 405(g) is limited to determining whether substantial evidence in the record as a whole supports the Commissioner's decision and, if so, to affirming that decision.  *Howe v. Astrue,* 499 F.3d 835, 839 (8th Cir. 2007).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kluesner v. Astrue,* 547 F.3d 933,

935 (8th Cir. 2008). The Court must consider evidence that both detracts from, as well as supports, the Commissioner's decision. *Carlson v. Astrue,* 604 F.3d 589, 592 (8th Cir. 2010). As long as substantial evidence supports the Commissioner's decision, that decision may not be reversed merely because substantial evidence would also support a different conclusion or because a district court would decide the case differently. *Frederickson v. Barnhart,* 359 F.3d 972, 976 (8th Cir. 2004).

## DISCUSSION

**I.     Treating Physician and Treating Therapist**

Roth argues that the ALJ failed to give controlling weight to the opinion of his treating psychiatrist, Dr. Clyne. Specifically, Roth argues that it was Dr. Clyne's opinion that Roth's daily activities were moderately to markedly limited due to his condition. Roth also argues that the ALJ did not consider the factors set out in 20 C.F.R. § 404.1527(d) in evaluating Dr. Clyne's opinion. Finally, Roth argues that the ALJ improperly evaluated the opinion of Paugels, Roth's mental health therapist.

20 C.F.R. § 404.1527(d)(2) provides that a treating physician's opinion is given controlling weight if "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."

§ 404.1527(d)(2) states that in evaluating a treating source's opinion, the following factors are considered: length and frequency of treatment by the physician; the nature and extent of the treatment relationship; the degree of medical evidence supporting the opinion;

the consistency of the opinion with the record as a whole; whether the treating source is

a specialist in the area in question; and other factors brought to attention.  20 C.F.R. §

404.1527(d)(2)(i) & (ii), (d)(3)-(6).

Social Security Ruling 96-2p provides:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well- supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well- supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; i.e., it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

SSR 96-2p, 1996 WL 374188, at *1 (Soc. Sec. Admin. July 2, 1996).

Social Security Ruling 06-3p states that a therapist, while not an "acceptable

medical source" capable of rendering a medical opinion, is an "other source" whose opinion

may be considered to show "the severity of the individual's impairment(s) and how it affects

the individual's ability to function."  SSR 06-3p, 71 F.R. 45593-03, 2006 WL 2263437, at 45594 (Soc. Sec. Admin. Aug. 9, 2006).

The ALJ's rejection of Dr. Clyne's statement that Roth was disabled was based on, and is supported by, numerous parts of the record.  Roth's enjoyment of fishing as a hobby was only one factor mentioned, and this Court does not view Roth's fishing hobby as a major factor in rejecting Dr. Clyne's opinion that Roth is disabled.  Similarly, this Court is aware that a long-term live-in relationship with one girlfriend might not be a strong factor rebutting claims of social anxiety, which manifests itself primarily in social settings involving more than one other person as opposed to an intimate relationship.  However, when considering the opinions of Dr. Clyne and Ms. Paugels, the record is replete with evidence inconsistent with those opinions, as noted in the factual summary of the record above.  For example:

•     although Dr. Clyne states Roth is disabled due to social anxiety, her notes reflect that Roth was consistently cooperative, logical, alert, and oriented, albeit anxious;

•     Dr. Clyne recommended that Roth receive vocational rehabilitation and work, with some coaching, noting he would have physical limitations due to arthritis;

•     when applying for a commercial driving license, Roth stated he had no physical or mental illnesses;

•     during an interview regarding potential vocational rehabilitation, in discussing the possibility of starting his own business making leather items such as purses, wallets, and belts, Roth said while his social anxiety would prevent him from selling at craft shows he would be comfortable marketing his products individually to businesses;

22

- the agency physicians opined that Roth could work with others assuming limited or superficial contact;

- Roth's girlfriend, Sharon Zinn, said that Roth could run simple errands, and Roth said he grocery shopped weekly;

- Roth's stated reason for not seeking work on at least one occasion was that he was waiting for disability payments;

- Roth stated that he only had difficulty in groups of at least four people;

- on at least two occasions, Roth told Dr. Clyne his social anxiety was improving; and

- Dr. Clyne and Zinn both said Roth was bored and needed something to do.

For these reasons, the Court concludes that the ALJ was correct in not giving controlling weight to Dr. Clyne's opinion as Roth's treating physician, and the ALJ properly assigned little weight to Ms. Paugels's opinion.

## II.   RFC

"'Residual functional capacity' is defined as the most an individual can still do despite the 'physical and mental limitations that affect what [the individual] can do in a work setting' and is assessed based on all medically determinable impairments, including those not found to be 'severe.'" *Baker v. Barnhart,* 457 F.3d 882, 889 n.3 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1545(a)(1) & (2)).

An ALJ determines a claimant's RFC based on "'all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Davidson v. Astrue,* 578 F.3d 838, 844 (8th Cir. 2009) (quoting *Lacroix v. Barnhart,* 465 F.3d 881, 887 (8th Cir. 2006)).

In Roth's case, the ALJ thoroughly weighed the following evidence in deciding the issue of Becker's RFC: Roth's physical and mental impairments; Roth's testimony; medical records, including therapy records; the opinion of Roth's girlfriend; and the opinions of state agency medical consultants.  In evaluating the credibility of Roth and his treating physician, Dr. Clyne, the ALJ concluded that their testimony and evidence was inconsistent with most other evidence in the record.

In reviewing the evidence and the arguments, the Court agrees with the ALJ's summary of the documentary evidence, including the medical reports.  The Court was impressed by the many inconsistencies presented between the opinions of disability based on social anxiety and other evidence in the record indicating that Roth could work with an appropriate amount of contact with others.

In summary, the ALJ appropriately considered all of the available relevant evidence, made wise credibility determinations, and correctly determined that Roth has the RFC to perform the type of suggested work.

## III.    Roth's Credibility

Roth argues that the ALJ's finding that his testimony was not credible is not supported by substantial evidence on the record.  Roth claims that although the ALJ cited to the proper factors to be considered in determining his credibility, the ALJ failed to weigh every factor as set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).  The ALJ found that Roth's testimony was not credible in light of the criteria set out in 20 C.F.R. §§ 404.1529, 416.929, Social Security Ruling 96-7p, and *Polaski*.  Specifically, the ALJ noted: Roth's: history of binge drinking, against his physicians' advice for, among other reasons, alcohol diminishes the effectiveness of his medications and affects his mental health;

24

Roth's history of DUI offenses; Roth's continued smoking habit, despite his physician's warning that it aggravates his DVT; Roth's noncompliance with his physician's order to wear support hose; and Roth's statement that vocational rehabilitation should close his file while he tries to get disability.

Contrary to Roth's assertion, the ALJ's decision need not include a discussion of every *Polaski* factor.   *Casey v. Astrue,* 503 F.3d 687, 695 (8th Cir. 2007).   The ALJ determined that Roth's complaints are inconsistent with medically objective evidence, which was detailed in the ALJ's opinion.   Several examples of inconsistencies were noted. Roth argues several points of minutia in discussing the ALJ's reasoning, i.e., his DUIs are old, a DUI does not suggest a lack of credibility, the ALJ's statement that Roth is unmotivated to work contrasts with a question posed by the ALJ at the hearing.   However, the discrete points argued by Roth fail to overcome the result after the application of the *Polaski* factors to his case.

In summary, the ALJ did not err in concluding that Roth's testimony was not credible.

## IV.   Past Relevant Work

Roth argues that the ALJ's finding that he can perform his past relevant work as a construction worker, garbage collector, general laborer, and material handler is not supported by substantial evidence.   The ALJ relied on the VE's testimony.   The ALJ was not required to consider Roth's testimony or the opinions of Dr. Clyne and Ms. Paugels regarding mental limitations, as the ALJ found that testimony and those opinions not credible.   Although the ALJ was not required to continue the sequential process to step five because she found that Roth can perform his past relevant work, she did so and found that

25

he can also perform other jobs available in the local economy.

The ALJ's opinion regarding Roth's ability to perform his past relevant and other work is supported by substantial evidence on the record as a whole.

## CONCLUSION

For the reasons discussed, the Court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and is affirmed.

IT IS ORDERED:

1.      The Commissioner's decision is affirmed;

2.      The appeal is denied; and

3.      Judgment in favor of the Defendant will be entered in a separate document.

DATED this 23rd of June, 2010.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge